**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**SOUTHEASTERN STUD & COMPONENTS, INC.**                    **PLAINTIFF**

**v.**                    **4:07-CV:00593-WRW**

**AMERICAN EAGLE DESIGN BUILD STUDIOS, L.L.C.,** *et al*.    **DEFENDANTS**

<u>**ORDER**</u>

Pending is Defendant CEI Investment Corporation's ("CEI") and Defendant Salvatore Carabetta's Motion to Dismiss for Lack of Personal Jurisdiction, or Alternatively, to Dismiss Counts Four and Nine for Failure to State a Claim Upon Which Relief Can be Granted (Doc. No. 122).

Defendant Salvatore Carabetta's Motion to Dismiss for Lack of Personal Jurisdiction (Doc. No. 122) is DENIED.

Defendant CEI's Motion to Dismiss for Lack of Personal Jurisdiction (Doc. No. 122) is GRANTED.

Defendants' Alternative Motion to Dismiss Counts Four and Nine for Failure to State a Claim Upon Which Relief Can be Granted (Doc. No. 122) is DENIED in connection with Count Four, and MOOT in connection with Count Nine.

Defendants' earlier filed Motion to Dismiss for Lack of Personal Jurisdiction (Doc. No. 63) is DENIED as MOOT.

**I. BACKGROUND**

Plaintiff's Corrected Amended Complaint alleges the following facts. Housing at the Little Rock Air Force Base ("LRAFB") was privatized on or around August 1, 2004, as part of the Military Housing Privatization Initiative.[1] The United States Air Force chose Little Rock

---

[1] Doc. No. 56.

1

Family Housing as its management partner for the privatized housing project (the "Project"), a project to privatize and construct new single-family housing units at the LRAFB.[2] Little Rock Family Housing is a subsidiary of American Eagle;[3] American Eagle is joint venture between Shaw Infrastructure and CEI Investment Corporation ("CEI").[4] American Eagle Design Build Studios ("AEDBS") is owned in part by CEI. Defendant Carabetta allegedly is, or was at relevant times, the Managing Partner/Director of CEI, Little Rock Family Housing, and American Eagle Design Build Studios.[5]

Little Rock Family Housing selected AEDBS as the prime contractor for the Project.[6] On August 23, 2006, Plaintiff entered into a Subcontract Work Agreement ("Subcontract") with AEDBS, allegedly after assurances from AEDBS that the entity was separate and independent from Defendant Carabetta.[7] Under the Subcontract, Plaintiff was obliged to perform steel framing fabrication and erection for 98 Project houses, with a contract amount not to exceed $3,867,512.25.[8] The maximum contract price was later reduced to $3,677,019.95.[9] Defendant

---

[2]*Id.*

[3]It is interesting to note the addresses of several of the Defendants: American Eagle - 74 Cambridge Street, Meriden, CT; AEDBS - 74 Cambridge Street, Meriden, CT; Little Rock Family Housing - 74 Cambridge Street, Meriden, CT; Salvatore Carabetta - 200 Pratt Street, Meriden, CT; CEI - 200 Pratt Street, Meriden, CT.

[4]Doc. No. 56.

[5]*Id.*

[6]*Id.*

[7]*Id.*

[8]*Id.*

[9]*Id.*

Arch issued the Payment Bond ("Bond") providing for the payment of sub-contractors that worked on the Project.[10]

Plaintiff began performing its contractual obligations by producing and erecting steel framing and issued ten payment applications.[11] Defendant AEDBS paid seven of the ten payment applications, but did not pay for applications eight, nine, or ten, for a total amount owing of $1,151,608.60.[12] Allegedly, Defendants American Eagle, Shaw Infrastructure, Little Rock Family Housing, and AEDBS, through their representatives Tom Swain and Defendant Carabetta, assured Plaintiff that payment would be issued if it continued to perform.[13] In a meeting at the Dallas-Ft. Worth Airport on January 27, 2007, Shaw Infrastructure's Director of Privatization, Tom Swaim, allegedly speaking on behalf of AEDBS, American Eagle, Carabetta, and Shaw Infrastructure, represented that Plaintiff would be paid if it continued to perform under the Subcontract.[14] Plaintiff explained to AEDBS that the delay in payment was effecting its credit, that its line of credit through its lender was in default, and that further delay in payment could cause it to go out of business.[15]

AEDBS ultimately acknowledged that it could not pay Plaintiff, and in February, 2007, Plainitff stopped working on the Project. In a letter dated February 28, 2007, Plaintiff gave notice to AEDBS of default and demanded payment for labor and materials in an amount not less

---

[10]Doc. No. 56.

[11]*Id.*

[12]*Id.*

[13]*Id.*

[14]*Id.*

[15]*Id.*

3

than $1,362,125.00.[16] On March 9, 2007, Plaintiff gave notice to Arch that Plaintiff had stopped working on the Project, that the claim for work performed was not less than $1,425,313.41, and that Plaintiff demanded Arch pay the undisputed amounts pursuant to the terms of the Bond.[17] Ultimately, Arch paid Plaintiff $1,360,000.00 under the Bond.[18]

Plaintiff alleges that Defendant Carabetta, as the principal officer of American Eagle, AEDBS, CEI, and Little Rock Family Housing, so mismanaged the Project that the Project ran out of funding.[19] After the Project ran out of funds, Plaintiff alleges that Shaw Infrastructure appointed its Director of Privatization, Tom Swain, to be American Eagle's Managing Director.[20]

Allegedly, Defendants Shaw Infrastructure, American Eagle and AEDBS, through their representatives Tom Swain and Marc Nocera, told Plaintiff that it would receive payment if it executed partial lien releases in connection with certain payment applications; on May 31, 2007, the parties agreed that if Plaintiff signed partial lien releases and "receipt and releases" in connection with payment applications 8 and 9, it would receive payment for those applications, less 5% retainage.[21] Shaw Infrastructure issued checks payable to Plaintiff for payment applications 8 and 9, and Plaintiff submitted the executed releases to Marc Nocera.[22] On June 4,

---

[16]Doc. No. 56. A copy of the letter was also sent to Arch, American Eagle, CEI, Shaw Infrastructure, Little Rock Family Housing, and Salvatore Carabetta.

[17]*Id.*

[18]*Id.*

[19]*Id.*

[20]*Id.*

[21]*Id.*

[22]Doc. No. 56.

4

2007, Tom Swain informed Plaintiff that Shaw Infrastructure would "withdraw the checks" and that Plaintiff would not be paid for pay applications 8 and 9.[23]

Defendants Carabetta and CEI filed this Motion, asking the Court to dismiss for lack of jurisdiction, or, in the alternative, to dismiss Claims Six, Eleven, Twelve, and Thirteen.[24] Plaintiff asserts that this Court has jurisdiction over Defendant Carabetta because he has sufficient minimum contacts with Arkansas, and because he controls AEDBS and, therefore, ADEBS's corporate veil should be pierced.[25] Defendant Carabetta counters that any action he took in connection with the Projects were in his official capacity as a member of AEDBS's management, and that he doesn't have the minimum contacts with Arkansas required for personal jurisdiction.[26]

## II. DISCUSSION

### A. Personal Jurisdiction

When a defendant challenges a federal court's jurisdiction, the plaintiff has the burden of proving that the court's jurisdiction is proper by making a *prima facie* showing that jurisdiction exists.[27] Plaintiff's burden for proving jurisdiction is less than by the preponderance of the evidence until trial, or until a special evidentiary hearing is held.[28] In deciding a motion to

---

[23]*Id.*

[24]Doc. No. 63.

[25]Doc. Nos. 66, 94.

[26]Doc. Nos. 68, 104.

[27]See *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1072-73 (8th Cir. 2004); *Scullin Steel Co. v. Nat'l. Ry. Utilization Corp.*, 676 F.2d 309, 311 (8th Cir. 1982).

[28]See *Dakota Industries, Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1387 (8th Cir. 1991) (citing *Cutco Ind. v. Naughton*, 806, F.2d 361, 365 (2d Cir. 1986).

dismiss for lack of jurisdiction, "[i]f the district court does not hold a hearing and instead relies on pleadings and affidavits . . . the court must look at the facts in the light most favorable to the nonmoving party."[29]

In establishing jurisdiction, a federal court sitting in diversity must consider whether the forum state's long-arm statute is satisfied, and whether jurisdiction in consistent with the Due Process Clause.[30] The Arkansas long-arm statute provides, in part, that "[t]he courts . . . shall have personal jurisdiction of all persons, and all causes of action or claims for relief, to the maximum extent permitted by the due process of law clause of the Fourteenth Amendment of the United States Constitution."[31] Accordingly, the analysis here is limited to whether jurisdiction over Defendant Carabetta would violate the Due Process Clause.

Under the Due Process Clause, a defendant must anticipate that, because of his conduct or contact with a forum state, he could be brought to court there.[32] The defendant must have minimum contacts with the forum state so that asserting jurisdiction would "comport with 'fair play and substantial justice.'"[33] Generally, if a defendant directed its actions to a forum state, and injuries arise from those actions, the defendant can expect to be haled into court in the forum state.[34]

---

[29]*Id.* at 1388 (citing *Watlow Elec. Mfg. v. Patch Rubber Co.*, 838 F.2d 999, 1000 (8th Cir. 1988)).

[30]See *Dever*, 380 F.3d at 1072-73.

[31]Ark. Code Ann. § 16-4-101 (2008).

[32]*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

[33]*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945)).

[34]*Id.* at 472-73.

The United States Supreme Court recognized that jurisdiction over an agent-defendant may be proper when the plaintiff alleged an intentional tort.[35] In *Calder v. Jones*, the plaintiff, a California resident, sued defendants, Florida residents employed by the National Enquirer, for libel over an article they wrote about the plaintiff.[36] The defendants argued that they wrote the article as employees of the National Enquirer, that the article had been written and edited in Florida, and that they had insufficient contacts with California for personal jurisdiction there to be proper.[37] The California Court of Appeal found that jurisdiction was proper because the defendants committed an intentional tort against the Californian plaintiff.[38] The United States Supreme Court affirmed, writing:

> Petitioners are not charged with mere untargeted negligence. Rather, their intentional, and allegedly tortious, actions were expressly aimed at California. Petitioner South wrote and petitioner Calder edited an article they know would have a potentially devastating impact upon respondent. And they knew the brunt of that injury would be felt respondent in the state in which she lives and works and in which the National Enquirer has its largest circulation. Under the circumstances, petitioners must 'reasonably anticipate being haled into court there' to answer for the truth of the statements made in their article. And individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California.

Thus, an individual's contact with a forum state should not be judged by its employer's activities there, but an individual's status as an agent does not necessarily "insulate [him] from jurisdiction."[39] "Each defendant's contacts must be assessed individually."[40]

---

[35] See *Calder v. Jones*, 465 U.S. 783, 791 (1984);

[36] *Id.* at 786.

[37] *Id* at 789.

[38] *Id*. at 787-88.

[39] *Id.* at 790.

[40] *Id.*

7

The Eighth Circuit, of course, follows *Calder*.[41] In *Dakota Industries, Inc. v. Dakota Sportswear, Inc.*, the Eighth Circuit Court of Appeals recognized the Eighth Circuit's traditional *Land-O-Nod*[42] factors used to determine whether jurisdiction was proper under the due process clause, but "note[d] that *Calder* requires the consideration of additional factors when an intentional tort is alleged."[43] In *Dakota*, the Court of Appeals reversed the District Court's dismissal for lack of personal jurisdiction.[44]

### 1. Defendant Carabetta

Plaintiff's Count VI is an allegation of fraudulent inducement, an intentional tort. The question here, then, is whether there is evidence in the record that supports Plaintiff's fraudulent inducement claim against Defendant Carabetta. I believe there is.

Plaintiff alleges that Defendant Carabetta fraudulently induced it to: (a) enter into the Subcontract; (b) continue working on the project when he knew Plaintiff would not be paid; and (c) sign lien releases on assurances Plaintiff would be paid.

In connection with being promised payment, Plaintiff alleges that in a meeting on January 27, 2007, Shaw Infrastructure's Director of Privatization, Tom Swain, told Plaintiff's representative, Kennon Whaley, that if Plaintiff continued working on the Project, it would be

---

[41]See *Dakota Indus. v. Dakota Sportswear*, 946 F.2d 1384 (8th Cir. 1991); *Hicklin Engineering, Inc. v. Aidco, Inc.*, 959 F.2d 738 (8th Cir. 1992); *Finley v. River North Records*, 148 F.3d 913 (8th Cir. 1998).

[42]*Land-O-Nod Co. v. Bassett Furniture Industries*, 708 F.2d 1338 (8th Cir. 1983). The Land-O-Nod factors are: the nature and quality of the contacts with the forum state; (2) the quantity of the contacts with the forum state; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties.

[43]*Dakota Indus.*, 946 F.2d at 1392.

[44]*Id.*

paid.[45] This was after Plaintiff had not been compensated for work in connection with pay applications 8, 9, and 10. Plaintiff continued working on the Project, but allegedly was not paid as promised.

In its First Amended Response to Defendants Motion to Dismiss for Lack of Personal Jurisdiction, Plaintiff attached numerous emails to, from, or copying Defendant Carabetta. Several of those emails evidence a plan to change from the metal framing provided by Plaintiff to wood framing. With respect to that plan, the emails were exchanged mostly between Defendant Carabetta, Ross Burton (Senior Project Manager of SRC Construction, of which Defendant Carabetta is President and Director),[46] David McMurtry, Tom Brockway, and Howard Lazarus.[47] Those parties discussed how to get AEDBS out of its contract with Plaintiff, so that AEDBS could contract for wood frames.[48]

It is clear from the emails that the correspondents did not want Plaintiff to complete its performance under the contract. One email, dated January 8, 2007, from Defendant Carabetta to Ross Burton, discusses another company, Capitol, that could take over the framing for 49 homes. Defendant Carabetta wrote about Capitol: "Engage them now - don't wait for SES to stop." In the same email, Mr. Burton wrote: "Regarding SES, how do we ensure that they are not to receive any more funding for the project . . . ?" Defendant Carabetta responded: "I'll advise Paul Goode."

---

[45]Doc. No. 56.

[46]Doc. No. 63.

[47]Doc. No. 94.

[48]*Id*.

In an email, dated March 21, 2007, from Plaintiff's representative, Kennon Whaley, to Steve Dicks and copying Tom Swain, and Michael Hood (Plaintiff's attorney), Mr. Whaley wrote: "I have been very patient since Mr. Swain informed us 2 weeks ago that funds had been approved and would be coming. I can only wait so long."[49] Tom Swain forwarded the email to Steve Dicks, Tom Brockway, Ross Burton, and copied Howard Lazarus.[50] Tom Swain wrote: "The first installment is ready and Carabetta is the hang-up. Tom [Brockway], you are aware as to how it will be paid . . . ." and "Please let me know what we plan to discuss with Whaley."

Based on these emails, it appears to me that: (1) Defendant Carabetta knew already on January 8, 2007 -- well before the January 27, 2007, meeting between Whaley and Swain -- that AEDBS would not receive further payment; (2) Steve Dicks, Tom Brockaway, Ross Burton (of SRC Construction), and Howard Lazarus turned to Defendant Carabetta for decisions in connection with AEDBS and the Project; and (3) that Tom Swain turned to Steve Dicks, Tom Brockaway, Ross Burton (of SRC Construction), and Howard Lazarus for instruction about the Project and how to handle issues with Plaintiff.

Plaintiff did not receive any further payment after January 8, 2007.

The record suggests that Defendant Carabetta was involved in ensuring that Plaintiff received no further funding. Defendant Carabetta knew, as of January 8, 2007, that Plaintiff would not be paid. The contract between Plaintiff and AEDBS was for work in Arkansas. The Project was in Arkansas. Plaintiff alleged that because of Defendants' non-payment for the work done in Arkansas, Plaintiff was unable to operate its business.[51] The facts of this case support a

---

[49] *Id.*

[50] *Id.*

[51] Doc. No. 56.

finding, under the reasoning of *Calder*, that this Court can properly exercise personal jurisdiction over Defendant Carabetta.

In addition to *Calder*, I now consider the *Land-O-Nod* factors, which are: (1) the nature and quality of the contacts with the forum state; (2) the quantity of the contacts with the forum state; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties.[52]

Defendant Carabetta had contact with Arkansas through his involvement as member of the management of AEDBS and its involvement with the Project. He visited Arkansas twice to view the Project. The nature of the cause of action is directly related to Defendant Carabetta's involvement with the Project. Arkansas appears to be a convenient forum.

Considering all facts together and in the light most favorable to the nonmoving party, this Court may properly exercise personal jurisdiction over Defendant Carabetta.

### 2. Defendant CEI

Plaintiff asserts this Court has jurisdiction over Defendant CEI because Defendant Carabetta controls AEDBS, controls CEI, and AEDBS's corporate veil should, for those reasons, be pierced.

Plaintiff was allowed to conduct limited jurisdictional discovery.[53] After conducting that discovery, Plaintiff submitted a revised Response to Defendants' Motion.[54] Plaintiff attached to its Response multiple emails to, from, or copying Defendant Carabetta.[55] Neither the emails, nor

---

[52]*Land-O-Nod Co. v. Bassett Furniture Industries*, 708 F.2d 1338 (8th Cir. 1983).

[53]Doc. No. 81.

[54]Doc. No. 94.

[55]*Id*.

the allegations in Plaintiff's Corrected Amended Complaint, show that the corporate form of AEDBS was abused to such an extent that piercing the corporate veil would be proper. Plaintiff neither sufficiently pled nor included evidence that: AEDBS did not adhere to corporate formalities; interchanged employees (beyond Defendant Carabetta), facilities, or funds; that AEDBS filed improper tax returns; *etc*. There is evidence of fraud, but that evidence is not enough to disregard AEDBS's corporate form. In Arkansas, " piercing the fiction of a corporate entity should be applied with great caution."[56] Arkansas courts are more prone to pierce when there has been fraud, but, even in those cases, there is evidence in the record with respect to corporate formalities, ownership, *etc*.[57]

Defendant CEI does not have the requisite minimum contacts to render personal jurisdiction proper. Accordingly, Defendant CEI's Motion to Dismiss for Lack of Jurisdiction is GRANTED.

### B. Count Four: Fraudulent Inducement

Defendants assert that Plaintiff's claim for fraudulent inducement should be dismissed because the claim does not meet the heightened pleading standards for fraud found in Rule 9(b) of the Federal Rules of Civil Procedure.[58] Plaintiff's Amended Complaint sets out the "who, what, where, when and how"[59] in enough detail to survive Defendants' Motion to Dismiss. Accordingly, Defendants' Motion is DENIED in connection with this claim.

---

[56]*Anderson v. Stewart*, 366 Ark. 203, 207 (2006).

[57]See *Envirclean, Inc. v. Arkansas Pollution Control & Ecol. Comm'n*., 314 Ark. 98 (1993); *Humphries v. Bray*, 271 Ark. App. 962 (1981); *Winchel v. Craig*, 55 Ark. App. (1996).

[58]Doc. No. 64.

[59]*United States ex rel. v. St. Luke's Hospital, Inc*., 441 F.3d 552, 556 (8th Cir. 2006) (citations omitted).

**C. <u>Count Nine</u>**

Defendants' Motion to Dismiss Count Nine against Defendant CEI is DENIED as MOOT.

**IV. CONCLUSION**

Defendants' Motion to Dismiss for Lack of Personal Jurisdiction (Doc. No. 122) is DENIED in connection with Defendant Carabetta, and GRANTED in connection with Defendant CEI. Defendants' Alternative Motion to Dismiss Claims Counts Four and Nine for Failure to State a Claim Upon Which Relief Can be Granted (Doc. No. 122) is DENIED in connection with Count Four, and MOOT in connection with Count Nine.

IT IS SO ORDERED this 1st day of August, 2008.

/s/ Wm. R. Wilson, Jr._____
UNITED STATES DISTRICT JUDGE